UNITED STATES of America,
Plaintiff,

v.

The NORTHERN TRUST COMPANY,
as Trustee of the Caterpillar Tractor
Company Master Trust, Defendant.

United States of America, Plaintiff,

v.

The Northern Trust Company, as Trustee of the Inland Steel Industries Pension Trust, Defendant.

Nos. 98 C 7272, 98 C 8217.

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 29, 2000.

Samuel D. Brooks, United States Atty's Office, Chicago, IL, Stacy Hallet, Donald J. Gavin, United States Dept. of Justice, Washington, DC, for plaintiff.

Jeffrey E. Stone, Steven Samuel Scholes, Matthew F. Kluchenek, McDermott, Will & Emery, Chicago, IL for defendant.

## MEMORANDUM AND ORDER

MORAN, Senior District Judge.

On December 22, 1998, the government filed two complaints pursuant to Internal Revenue Code ("IRC") § 7405 to recover tax refunds issued to the Inland Steel Industries Pension Trust (Inland Trust) (98 C 8217) and the Caterpillar Tractor Company Master Trust (Caterpillar Master Trust) (98 C 7272). The Northern Trust Company (Northern Trust), the named defendant in both actions, served as trustee and securities lending agent for both Inland Trust and Caterpillar Master Trust (collectively "the trusts") during the taxable years in question.[1] In nearly identical complaints, the government alleges that the tax-exempt trusts were not entitled to refunds they received for taxes paid on a security's undistributed capital gains because the trusts had previously transferred the benefits and obligations incident to stock ownership to other taxpayers. We have jurisdiction over these matters pursuant to 26 U.S.C. § 7402 and 28 U.S.C. §§ 1340 and 1345. Defendant moves to dismiss the pre–1995 claims pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, arguing that the government's complaints are insufficient to trigger the extended five-year statute of limitations available under IRC § 6532(b) for claims to recover refunds induced by fraud or misrepresentation of fact.

## BACKGROUND

When deciding a motion to dismiss we must assume the truth of a plaintiff's well-pleaded factual allegations, making all possible inferences in the plaintiff's favor. *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund*, 25 F.3d 417, 420 (7th Cir. 1994). Accordingly, the following factual allegations contained in the government's amended complaints are taken as true for the purpose of deciding these motions to dismiss.

Inland Trust is a tax-exempt organization established to administer the qualified retirement plans of Inland Steel Industries. Caterpillar Master Trust is a tax-exempt organization established to administer the qualified retirement plans of the Caterpillar Tractor Company. The Northern Trust Company serves as trustee for both trusts and, as such, acts on behalf of these organizations with respect to securities owned by the trusts. During the taxable years in question the trusts owned shares of a closed-end regulated investment company[2] (an "RIC") known as the Quest for Value Dual Purpose Fund ("Quest"). All of the Quest shares owned by the trusts were held at Depository Trust Company ("DTC"), a service company owned by major members of the financial industry, including Northern Trust. DTC operates as a national clearinghouse for the settlement of securities trades and, with its nominee, Cede & Co., acts as a custodian of securities for participating banks.

Pursuant to "stock loan agreements" with the trusts, Northern Trust was authorized to transfer or "lend" shares of Quest to third parties. Although the transferees under the loan agreements were designated as "borrowers," the loan agreements provided that the "borrowers" actually acquired all incidents of ownership with respect to the "borrowed" securities, including the right to vote, the right to sell, and the right to transfer or lend the securities to others. In return, the trusts received a fee plus cash-equivalent collateral equal to 102% of the market value of the shares at the time of the transfer.

For each of the years 1991 through 1995, Quest had undistributed long-term net capital gains. According to the requirements of the IRC, Quest filed a re-

---

**1.** Erroneous refunds to Caterpillar Master Trust are alleged for the taxable years 1991–1995; erroneous refunds to Inland Trust are alleged for the taxable years 1993–1995.

**2.** *See* 26 U.S.C. § 851.

turn each year and paid the federal income taxes due on the capital gains. Quest also issued an IRS Form 2439—Notice to Shareholders of Long–Term Capital Gains—to Cede & Co. (as nominee of DTC, custodian of the shares managed by Northern Trust on behalf of the trusts) that designated DTC's proportional share of the undistributed capital gains and of the tax paid on the undistributed capital gains. Shareholders must include their proportionate share of undistributed capital gains in their individual computation of capital gains and are given a *credit* for the proportionate share of the tax paid by the RIC. Accordingly, DTC reissued Forms 2439 to those entities to which a portion of Northern's shares of Quest had been transferred pursuant to the stock loan agreements and to Northern Trust itself, to the extent it retained shares of Quest as of the last day of Quest's taxable year. The following table sets out the share of undistributed capital gains and taxes paid by Quest attributable to Northern Trust's various custodial clients (as allegedly reported on Form 2439 by DTC through its nominee Cede & Co. to Northern Trust).

| Taxable Year | Undistributed Capital Gains | Paid Capital Gains Tax |
|---|---|---|
| 1991 | figures not provided | figures not provided |
| 1992 | $2,202.39 | $748,668.84 |
| 1993 | 465,120.66 | 162,788.70 |
| 1994 | 170,304.83 | 59,605.35 |
| 1995 | 338,871.48 | 118,603.88 |

**TABLE A**

According to the government, Northern Trust then prepared and issued to the trusts Forms 2439 that "erroneously" reflected the trusts' proportionate shares of taxes paid by Quest on its undistributed capital gains. The following table sets out the trusts' shares of Quest's undistributed capital gains and taxes paid as reported each year on Form 2439 by Northern Trust to Inland Trust and Caterpillar Master Trust, respectively.

| Taxable Year | INLAND TRUST | | CATERPILLAR MASTER TRUST | |
|---|---|---|---|---|
| | Undistributed Capital Gains | Paid Capital Gains Tax | Undistributed Capital Gains | Paid Capital Gains Tax |
| 1991 | n/a | n/a | $1,736,700.00 | $590,500.00 |
| 1992 | n/a | n/a | 2,816,820.00 | 957,690.00 |
| 1993 | $2,374,680.00 | $831,120.00 | 3,562,020.00 | 1,246,680.00 |
| 1994 | 905,579.80 | 316,967.04 | 1,444,050.00 | 505,440.00 |
| 1995 | 2,005,605.00 | 701,955.00 | 3,119,830.00 | 1,091,930.00 |

**TABLE B**

Each year Northern Trust also filed Forms 990–T with the IRS seeking a refund on behalf of the trusts of the taxes paid on Quest's undistributed capital gains. The Forms 2439, allegedly prepared by Northern Trust, were attached to the Forms 990–T. The Internal Revenue Service refunded all of the claimed overpay-

ments, occasionally with interest.[3] At some point after November 18, 1996, however, the IRS determined that the Forms 2439 submitted by Northern Trust reflected, at least in part,[4] undistributed capital gains, and tax paid on those gains, for shares of Quest which the trusts had previously transferred to others pursuant to the stock loan agreements.

On December 22, 1998, the government filed two complaints pursuant to IRC § 7405, which authorizes an action by the United States to recover an erroneous refund of "any portion of a tax imposed by [the tax code]." The complaints allege that the IRS was "induced to issue the refund[s] based upon the misrepresentations of material facts made by Northern." Neither complaint alleges an intent to deceive or mislead, nor does either allege any willful, reckless, or even negligent misconduct.

Section 6532(b) of the Internal Revenue Code provides the applicable statute of limitations:

> Recovery of an erroneous refund by suit under section 7405 shall be allowed only if such suit is begun within 2 years after the making of such refund, except that such suit may be brought at any time within 5 years from the making of the refund if it appears that any part of the refund was induced by fraud or misrepresentation of a material fact.

The 1995 refunds fall within the two-year statute of limitations and are not at issue here. Defendant moves to dismiss the pre 1995 claims pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, arguing that the government failed to allege any misrepresentations of fact

which would allow the government to avail itself of the extended five-year period available under § 6532(b) for certain claims.

### ANALYSIS

The five-year period is triggered if "it appears that any part of the refund was induced by fraud or misrepresentation of a material fact." Defendant makes two arguments in support of its contention that the five-year provision is not applicable here. First, it suggests that the gravamen of the dispute concerns whether Inland and Caterpillar were "shareholders" of the loaned Quest shares as of December 31 of each year. This is a legal determination, defendant argues, and regardless of the legal position implicitly asserted on the Forms 990–T and 2439, there has been no "misrepresentation of *fact.*"

There is support for this position. In *U.S. v. Indianapolis Athletic Club (IAC)*, 785 F.Supp. 1336 (S.D.Ind.1991), the court rejected the government's attempt to use a conclusion of law to trigger the five-year limitations period under IRC § 6532(b). In that case the taxpayer submitted refund applications claiming that amounts previously paid to employees were "tips" rather than wages (as the IAC had earlier believed) and requesting a refund of the FICA tax paid on these amounts over seven preceding quarters. The IRS refunded the FICA taxes plus interest, but later determined that the refund had been in error. The government's position in the recovery action was that the amounts paid to IAC employees *were* wages, not tips, on which FICA withholding was accordingly due. The IRS sought to invoke the five-

3. For the taxable year 1991, the IRS also remitted interest of $15.21 to Caterpillar Master Trust. For the taxable year 1994, the IRS also remitted interest of $5,782.95 to Inland Trust.

4. The government acknowledges, at 5 n. 2, that Northern did hold a certain number of Quest shares for Inland and Caterpillar which were not transferred or loaned to other enti-

ties. The government makes this inference based on the uncontested Forms 2439 sent from DTC to Northern Trust, as reflected in Table A. The complaints, however, seek the return of the total amounts refunded, as reflected by columns 3 and 5 of Table B. We assume, therefore, that the prayers for relief would be adjusted to subtract refund amounts based on shares of Quest which were not transferred or loaned.

year period based on "the Defendant's knowingly improper characterization of the required service charges as 'tips' and not as wages." *Id.* at 1388 (internal quotations omitted). According to the IRS, if the Athletic Club had explained that the monies in question were collected as "service charges" and had identified whether such charges were voluntary, the IRS would have been able to accurately determine whether a refund was owed. The court disagreed that this was a "misrepresentation of a material fact." "To the extent that the use of the term 'tips' was a legal conclusion, the IRS was free ... to either rely on this appellation or to investigate the circumstances and reach its own conclusion." *Id.* at 1339. A contrary position would "give the IRS the ability to rewrite the statute of limitations enacted by Congress ... any time it chooses to differ with a legal conclusion of a taxpayer." *Id.* (citation and internal quotations omitted).

■ The same could be said here. Whether or not a party is a "shareholder" under a particular provision of corporate or tax law is a legal question, or at most a mixed question of law and fact. It is not a "fact" that "admits of being adjudged true or false in a way that admits of empirical verification." *Indianapolis Athletic Club*, 785 F.Supp. at 1338 (citation omitted). Whether or not Caterpillar or Inland were shareholders entitled to the undistributed capital gains and capital gains tax credit will turn on an interpretation of IRC §§ 852(b) and 1058 and the regulations outlined in the government's footnote 3. Clearly, "statutory construction is a question of law." *Armour & Co. v. Wilson & Co.*, 274 F.2d 143, 156 (7th Cir.1960); *see also Revenue Ruling 89–79*, 1989–1 C.B. 172 ("Although the term shareholder, when used in the Code, generally refers to the beneficial owner of shares, interpretation of that term, in section 562(c), to refer to the legal owner of the shares is consistent with the purposes of that section."); *Cabintaxi Corp. v. Commissioner*, 63 F.3d 614, 76 A.F.T.R.2d 95–5960, 95–2 USTC

¶ 50,445 (7th Cir.1995) (describing role of federal and state law in determination as to whether a particular investor is a "shareholder" for purposes of Subchapter S); *Pahl v. Commissioner*, 150 F.3d 1124, 82 A.F.T.R.2d 98–5418, 98–2 USTC P 50,-602 (9th Cir.1998) (same); *Revenue Ruling 84–79*, 1984–C.B. 190 (interpreting "stock ownership" with respect to IRC § 1504). If defendant concluded that the trusts were "shareholders" of the loaned stock and sought the refunds based on that good faith belief, it has not made a misrepresentation of fact, even if its legal premise was incorrect. This situation is, thus, distinguishable from the cases cited by defendants which either highlighted the need for a fact-based determination unimpeded by inexact verbal formulations, *see Commissioner v. Duberstein*, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960) (holding that fact-finding tribunal must determine existence of a "gift" for tax purposes based on its "experience with the mainsprings of human conduct"), or held that a taxpayer asserted facts that were known to be untrue, *see United States v. Cobb*, 1992 WL 427480, 93–1 USTC ¶ 50002 (N.D.Fla.1992) (finding that taxpayer continued to use previously extinguished tax deduction to secure tax refunds); *Merlin v. Sanders*, 243 F.2d 821, 824 (5th Cir.1957) (finding that taxpayer was "guilty" of making a "patent misrepresentation").

Of course, a taxpayer may not avoid the longer period if it has intentionally mischaracterized its status as a shareholder knowing that an application of the law to the facts would produce a contrary result. In those circumstances "fraud" would be implicated and there would be no need to invoke the "misrepresentation" provision. The government's complaints, however, give us no reason to assume or even infer, however, that Inland or Caterpillar intentionally mischaracterized their status under the relevant tax provisions.

Which leads us to defendant's second argument. Northern Trust argues that the five-year statute is only triggered

where a "non-benign" state of mind is alleged. Therefore, either the complaint fails because the government has not alleged a knowing misrepresentation or, if it has so alleged, the complaint is insufficient under Federal Rule of Civil Procedure 9(b), which requires claims of fraud or mistake to be alleged with particularity. The government does not argue that it has adequately alleged scienter; it proposes instead that any "incorrect representation of material facts" is sufficient to extend the statutory period.

Again defendant has the stronger argument. "Misrepresentation of fact" implies more than an innocent mistake or misstatement. In *H Graphics/Access, Ltd. v. Commissioner*, T.C. Memo.1992–345, 1992 WL 129882, the United States Tax Court was called upon to interpret IRC § 6224(c), which provides that settlement agreements in unified partnership proceedings are binding absent a showing of "fraud, malfeasance, or misrepresentation of fact." The court looked to the definition of "misrepresentation" in Black's Law Dictionary,[5] to case law holding that a "misrepresentation" sufficient to set aside a closing agreement requires a showing that one party intentionally made incorrect or misleading representations regarding the express terms in the agreement,[6] to legislative history indicating a congressional intention "to bury innocent mistakes in closing agreements," and to the administrative guidelines promulgated by the IRS,[7] and concluded that the term "misrepresentation" requires "a deliberate intent to deceive or mislead similar to that required to prove fraud." *Id; see also Rev. Ruling 73–514*, 1973–2 C.B. 415 (holding that a revenue agent's unintentional mistake in failing to include certain deductions in ar-

riving at the result upon which a closing agreement was based does not constitute a misrepresentation of a material fact for which the agreement may be set aside); *Brinkman v. Commissioner*, T.C. Memo. 1989–217, 1989 WL 43882 (interpreting the term "misrepresentation" as "an untrue statement of fact, which by implication, was intentional").

This interpretation is consistent with IRS guidelines and case law concerning other provisions of the tax code which include identical language. *See, e.g.,* Internal Revenue Manual (IRM) subsect. (20)986.1, Assertion Criteria for Civil Fraud Penalty (distinguishing the indicia of "fraud," including "deception; *misrepresentation of material facts;* silence when good faith requires expression; false or altered documents; evasion . . .; [and] conspiracy," from "mistake, inadvertence, reliance on incorrect technical advice, honest difference of opinion, negligence, [and] carelessness") (emphasis added); IRM subsect. 1218, Appeals (indicating that a case closed by Appeals on the basis of mutual concessions will only be reopened if the disposition involved "fraud, malfeasance, concealment or misrepresentation of material fact, *or* an important mistake in mathematical calculation") (emphasis added to highlight punctuation suggestive of two distinct categories: circumstances indicating deceitful conduct and circumstances involving a particular kind of innocent mistake); *see also UMC Electronics Co. v. U.S.*, 43 Fed. Cl. 776, 795 (1999) (noting that Contract Disputes Act defines "misrepresentation of fact," *see* 41 U.S.C. § 601(7), as "a false statement of substantive fact, or any conduct which leads to a belief of a substantive fact material to a

---

**5.** "A false statement of a substantive fact, or any conduct which leads to a belief of a substantive fact material to proper understanding of the matter in hand, made with intent to deceive or mislead." Black's Law Dictionary 1001 (6th ed.1990).

**6.** *Phoenix Insurance Co. v. Commissioner*, 29 B.T.A. 291 (1933).

**7.** Internal Revenue Manual (CCH), sec. 8(13)10, at 26,095–4, which provides:

(4) The term "misrepresentation" when used as a ground for setting aside a closing agreement connotes intentional deceit. It does not refer to a mere mistake of fact or law, whether unilateral or mutual, no matter how material . . . .

proper understanding of the matter in hand, made with intent to deceive or mislead").

■■■ With respect to the term "misrepresentation" as it is used in § 6532(b), we conclude that the five-year period is available only if there is an allegation of intentional or knowing misrepresentation of material facts. A dispute based upon an honest difference of opinion must be filed within two years after the refund. Statutes of limitations, like closing agreements and appellate decisions, are designed to promote the prompt resolution of disputes and to provide certainty and closure once the period has expired. In certain circumstances, however, the balance of interests favors an extension of the time for prosecution of the claim. As a matter of common law and under state fraudulent concealment statutes, a defendant may be estopped from invoking the statute of limitations where the plaintiff was induced by fraud, misrepresentations, or deception to refrain from filing a timely action. *See* Fraud, Misrepresentation, or Deception as Estopping Reliance on Statute of Limitations, 43 A.L.R.3d 429 (1972) (collecting cases). On the other hand, where the statements relied upon were merely a matter of opinion or were made without intent to deceive, estoppel has been denied. *Id.* It is also not uncommon for statutes to provide a longer enforcement period for "willful" violations of a statute. *See, e.g.,* 29 U.S.C. § 255 (extending the two-year statutory period to three years where the cause of action arises out of a "willful violation" of, *inter alia,* the Age Discrimination in Employment Act). Finally, our conclusion is bolstered by the Supreme Court's determination that the statutory predecessor to § 7405 was intended to *limit,* not enlarge, the government's authority to collect erroneous refunds.

> "No statute is necessary to authorize the United States to sue in such a case. The right to sue is independent of statute[.] Section 610 of the 1928 Act ... does not grant a new right, but is a limitation of the Governments long-established right to sue for money wrongfully or erroneously paid from the public treasury. Ordinarily, recovery of Government funds, paid by mistake to one having no just right to keep the funds, is not barred by the passage of time."

*United States v. Wurts,* 303 U.S. 414, 415–16, 58 S.Ct. 637, 82 L.Ed. 932 (1938) (citation omitted).

The government cites *Black Prince Distillery, Inc. v. United States,* 586 F.Supp. 1169, 1174 (D.N.J.1984), for the proposition that an action under § 6532(b) to recover an erroneous refund may be brought if the IRS was induced to make the refund based upon a negligent misrepresentation of a material fact. This is, at best, an exaggerated characterization of the court's holding. The government's counterclaim in *Black Prince* explictly alleged fraud and sought recovery of an erroneous refund pursuant to its general statutory authority to assess and collect taxes. Under 26 U.S.C. § 6501(c)(1) and (2), the government has unlimited time to proceed in court for the collection of taxes if there has been a false or fraudulent return with the intent to evade tax or a willful attempt to defeat or evade taxes. Concluding that the government could proceed despite the expiration of the five year period governing recovery of fraudulently-induced refunds under § 7405, the court sought an interpretation of the five-year provision under § 6532(b) that would not be subsumed by §§ 6501(c)(1) and (2). Citing *Merlin v. Sanders,* 144 F.Supp. 541, 543 (D.Ga.1956), *aff'd,* 243 F.2d 821 (5th Cir. 1957) for the proposition that § 6532(b) does not require willfulness, the court speculated that "it is conceivable that an action by the IRS to recover an erroneous refund induced by a grossly negligent misrepresentation of a material fact will be barred if not brought within the five year limit of section 6532(b)." 586 F.Supp. at 1174. This is hardly persuasive authority

for the government's position.[8] Moreover, as noted above, the Fifth Circuit concluded in *Merlin* that the taxpayer had been "guilty" of making "a patent misrepresentation." This is not the language of negligence.

█ In any case, the government's complaints against Northern Trust, in its capacity as trustee for Inland Trust and Caterpillar Master Trust, do not allege even a negligent misrepresentation, never mind gross negligence or an intent to mislead.[9] Accordingly, the claims to recover erroneous refunds issued for the taxable years 1991 through 1994 are time-barred pursuant to 26 U.S.C. § 6532(b). Defendant's motions to dismiss the pre–1995 refund claims are granted.

---

**8.** *United States v. Cobb, supra,* arguably could be read to support the government's position. The court allowed the five-year statute of limitation to apply where the refunds "were induced by the *misapplication,* in the defendant's amended returns, of an extinguished operating loss as a valid deduction." 1992 WL 427480, at*2. There are very few facts provided and the court's treatment of the issue is cursory. The opinion seems to suggest, however, that the taxpayer's continuing use of the operating loss to secure the refunds was knowingly improper.

**9.** For this reason we need not decide whether allegations of negligent misrepresentation fall within the ambit of Fed.R.Civ.P. 9(b). *Compare Brown v. Chaffee,* 612 F.2d 497 (10th Cir.1979) (Rule 9(b) applies to a cause of action which alleges that the opposing party made misrepresentations that were either intentional or negligent); *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433 (9th Cir.1987) (Rule 9(b) uniformly applied to claims of securities fraud, common law fraud, and negligent misrepresentation); *Breeden v. Richmond Community College,* 171 F.R.D. 189, 199 (M.D.N.C. 1997) (collecting cases and concluding 9(b) does apply to cases of negligent misrepresentation and omission); *with Newscope Technology, Ltd. v. Ameritech Information Industry Services, Inc.,* 1999 WL 199650, RICO Bus.Disp.Guide 9710 (N.D.Ill.) (Rule 9(b) does not apply to the tort of negligent misrepresentation because it is not

"sounded in fraud"); *Adamczyk v. Lever Bros. Co., Div. of Conopco,* 991 F.Supp. 931 (N.D.Ill.1997) (Rule 9(b) does not apply to allegations of negligent misrepresentation, but docs where plaintiffs allege "knowing conduct").

We are mindful, however, of the Seventh Circuit's observation in *Bankers Trust Co. v. Old Republic Insurance Co.,* 959 F.2d 677, 683 (7th Cir.1992), that Rule 9(b) "discourage[s people] from tossing ... accusations [of fraud] into complaints in order to induce advantageous settlements or for other ulterior purposes." The opportunity to extend a statute of limitations is the sort of "ulterior purpose" the court had in mind. We think it makes sense to apply a heightened pleading standard to allegations which would more than double the period in which the government could institute an action against a taxpayer for an erroneous refund. In these cases, the 9(b) pleading burden should not be onerous. It merely requires the government to identify "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Bankers Trust,* 959 F.2d at 683 (quoting *Sears v. Likens,* 912 F.2d 889, 893 (7th Cir.1990)). And although 9(b) allows that motive and intent may be pleaded generally, the pleading must include allegations from which it is *possible* to infer the requisite level of scienter.